406 So.2d 1273 (1981)
Lawrence R. RAETTIG, Appellant,
v.
STATE of Florida, Appellee.
No. VV-453.
District Court of Appeal of Florida, First District.
December 9, 1981.
*1274 J. Victor Africano, Live Oak, for appellant.
Jim Smith, Atty. Gen., and Miguel A. Olivella, Jr., Asst. Atty. Gen., for appellee.
ERVIN, Judge.
Raettig pled nolo contendere to two drug related charges, reserving on appeal his contention that the trial court erred in denying his motion to suppress contraband seized from a camper-truck after he had stopped it at an agricultural inspection station. For the following reasons, we agree with Raettig that the motion to suppress should have been granted, and accordingly vacate the judgments and sentences and remand the case for further proceedings consistent with this opinion.
On August 10, 1979, at approximately 1:00 a.m., Raettig stopped his 1979 Dodge pick-up truck, with an attached camper shell, at an inspection station. An agricultural inspector then asked the appellant for permission to inspect the camper portion of the truck. Raettig testified at the suppression hearing that he attempted to locate the key to the camper, but was unable to find it and so advised the inspector. Raettig told the inspector that the truck belonged to his brother. The inspector, becoming suspicious of the appellant's manner, summoned Deputy Sheriff Richard Tucker to the scene. Tucker spoke with the inspector and was advised of the circumstances surrounding Raettig's detention. Tucker asked the defendant for permission to open the camper top but appellant again explained that he did not have the key and further refused to give the deputy consent to forcibly enter his vehicle. Upon that refusal, Tucker approached the truck and made a cursory search of it from the outside. He attempted to look through the windows of the camper but was unable to see anything inside them because they had been painted. He was, however, able to observe through the window of the cab an ordinary road map which appeared to him to have red marks depicting the locations of the inspection stations in Suwannee County. Tucker then directed the appellant to drive his vehicle to the Suwannee County jail some 15 miles from the inspection station.
Although there is some uncertainty in the record, the agricultural inspector apparently accompanied the deputy and the appellant back to the jail to serve as an affiant for a search warrant to search the appellant's vehicle. Upon their arrival at the jail, Deputy Tucker was advised by an assistant state attorney that he could not search defendant's vehicle without a search warrant and that the deputy did not have probable cause to search Raettig's vehicle at that time. Nevertheless, Deputy Tucker, while appellant was still being detained at the jailhouse, went outside and, with his flashlight, began another search of defendant's vehicle from the outside. He observed at the rear of the truck a crack between the bed of the truck and the base of the camper top which was six to eight inches long and about one-half inch wide. In a kneeling position, and with the aid of the flashlight, he was able to observe through the small opening some plastic bags and to detect what appeared to him to be marijuana inside the bags. He then crawled underneath the truck and found a seed which he was then unable to identify with certainty, but which was later determined to be of marijuana origin.
Based upon these observations, the deputy obtained a search warrant, and, pursuant to the warrant, broke into the camper top *1275 and found eight plastic bags containing 168 pounds of marijuana and a yellow one gallon plastic jug containing hashish. Upon these facts, the trial court denied the motion to suppress.
The state argues that the trial court's denial of the motion to suppress can be justified on either of two theories: (1) stop and frisk, (2) plain view or open view.

I. Stop and Frisk
We premise our discussion of the subject with the observations that the agricultural inspector clearly had the authority pursuant to Section 570.15(1)(a), Florida Statutes (1979), to stop Raettig's truck. See Sharpe v. State, 370 So.2d 42 (Fla. 1st DCA 1979); Stephenson v. Dept. of Agriculture & Consumer Services, 329 So.2d 373 (Fla. 1st DCA 1976), aff'd. 342 So.2d 60 (Fla. 1976). Moreover, the unique type of administrative detention involved here would permit the inspector to detain appellant for a longer period of time than merely to ask a few preliminary questions. Sharpe v. State, supra, at 44. And, although Deputy Tucker was not an authorized officer pursuant to Section 570.15, his participation in the detention as a deputy sheriff would not invalidate the appellant's detention. See Gryzik v. State, 380 So.2d 1102 (Fla. 1st DCA 1980). Cf. Section 570.15(3). Finally, because Sections 570.15(1)(b) and 570.15(1)(a)6 give the agricultural inspector a right to apply for a search warrant to search a stopped truck, it was not improper for Deputy Tucker to require appellant to bring his truck to the county jail for the purpose of conducting a more thorough inspection there. Cf. Miller v. State, 368 So.2d 943 (Fla. 1st DCA 1979). Once, however, the deputy was unable to obtain a search warrant at the jail, any colorable administrative justification for Raettig's detention necessarily ceased. A search conducted pursuant to an agricultural inspection detention cannot be conducted without compliance with the same probable cause standards applicable to criminal cases. Pederson v. State, 373 So.2d 367, 369 (Fla. 1st DCA 1979), cert. den., 383 So.2d 1203 (Fla. 1980); Stephenson v. Dept. of Agriculture & Consumer Services, supra. Raettig, then, should have been free to leave the jail after Deputy Tucker was advised he had no probable cause to obtain a warrant.
The state, however, attempts to justify the deputy's further detainment of appellant by relying on Section 901.151, Florida's stop and frisk statute. Although such limited searches are authorized upon an officer's founded suspicion, not tantamount to probable cause that a crime either is being committed or was committed, that lesser standard does not give the officer carte blanche authority to conduct a frisk which is unlimited in duration. Detentions for such purposes have traditionally been of only transient length. For example, a 30-40-minute stop of a motorist suspected of transporting drugs was held to be of excessive duration and not to qualify under the theory of stop and frisk as an exception to the Fourth Amendment requirement that detentions be reasonable. See Sharpe v. United States, 660 F.2d 967 (4th Cir.1981).
Finally, reasons often given for authorizing investigatory stops have no applicability to Deputy Tucker's further detention of appellant at the jail. He had already preserved the status quo, cf. State v. Martinez, 376 So.2d 931 (Fla. 4th DCA 1979), by securing appellant inside the jail. He had already taken a cursory view of appellant's truck at the inspection station. His safety was not threatened at the jailhouse, and it cannot be seriously suggested that the search of the truck outside the jail was necessitated by the purpose of finding weapons. Cf. M.A.P. v. State, 403 So.2d 1384 (Fla. 2d DCA 1981).
We conclude that there is no conceivable theory upon which the detention below was legally justified, consequently any resulting frisk, whose purpose pursuant to Section 901.151 is restricted to a limited search for weapons, was similarly invalid.

II. Plain View or Open View
We next address the state's alternative contention that the order denying the motion to suppress can be sustained because the contraband was within the open or plain *1276 view of Deputy Tucker. The state places great reliance on Albo v. State, 379 So.2d 648 (Fla. 1980), in which the court justified, under plain view, an inadvertent observation of 35-40 bales of marijuana made by a police officer with the aid of a flashlight inside a motor home after he had legally entered it for the purpose of checking its identification number. The state's reliance on Albo is, however, misplaced. In Albo, the officer had made a prior valid intrusion into the motor home before he observed the contraband. The facts in the instant case disclose no prior intrusion, therefore plain view is inapplicable.
If the seizure of the contraband by Deputy Tucker can be upheld on any basis, it can rest only upon the theory of open view  a theory that applies to two discrete factual situations: (1) where both the officer and the contraband are positioned in a non-constitutionally protected area, so that any resulting seizure is not subjected to any Fourth Amendment strictures, and (2) where the officer is himself located outside of a constitutionally protected area and observes contraband within a protected area, he is then furnished probable cause to seize the item. See Ensor v. State, 403 So.2d 349 (Fla. 1981).
From a superficial standpoint it could be argued that the seizure must be sustained under the second category of open view since Deputy Tucker saw the contraband while standing outside the camper-truck. Yet, the existence of such facts does not necessarily mean that our inquiry is now concluded. Being reminded that "the Fourth Amendment protects people, not places ...", Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967), the focus of our inquiry should be narrowed to resolving the question of whether it can be said that Raettig exhibited a reasonable expectation of privacy in the contents that were seen within the camper. This inquiry involves the application of Katz's two-fold test: (1) Did the possessor manifest an actual subjective expectation of privacy to personal effects within an area, and, if so, (2) was his expectation one that society is prepared to recognize as reasonable?[1]Katz v. United States, supra, 389 U.S. at 361, 88 S.Ct. at 516 (1967) (Harlan, J., concurring).
Although Katz applied the test to invalidate the admissibility of evidence seized within a structure, it is clear that its rule may also be applied to protect the possessor's rights of privacy to contents seized from a vehicle. Admittedly, his rights of privacy in a vehicle do not rise to the same level as those in his home or apartment,[2]see United States v. Chadwick, 433 U.S. 1, 12-13, 97 S.Ct. 2476, 2484-2485, 53 L.Ed.2d 538 (1977); United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); Cardwell v. Lewis, 417 U.S. 583, 590, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1974) (plurality opinion); Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), nevertheless "[a] search even of an automobile, is a substantial invasion of privacy. To protect that privacy from official arbitrariness, the Court always has regarded probable cause as the minimum requirement for a lawful search." United States v. Ortiz, 422 U.S. 891, 894, 896, 95 S.Ct. 2585, 2587, 2588, 45 L.Ed.2d 623 (1975) (footnotes omitted).
Because then the Katz rule may apply, under appropriate circumstances, to invalidate *1277 the seizure of items within a vehicle that were visible outside the vehicle, we must first determine whether Raettig manifested an actual, subjective expectation that the property within the camper would remain free from public scrutiny. Once again, some broad principles from Katz are helpful: a person cannot be said to have exhibited an actual expectation of privacy if he "knowingly exposes [articles] to the public, even in his own home, or office... ." 389 U.S. at 351, 88 S.Ct. at 511. On the other hand, "what [a person] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." Id.
In the instant case, the record shows that Raettig took deliberate steps to conceal his personal effects inside the camper from public view: the windows of the camper had been painted over, thereby concealing its contents; its doors had been locked, and Raettig had refused access to the officers.
In the final analysis, whether a person may be said to have exhibited a subjective expectation of privacy in his possessions depends upon the totality of all the efforts he takes to secure his property from public view. Cf. Norman v. State, supra. Considering all the overt steps Raettig undertook, we do not consider that his failure to seal off an aperture eight inches in length and 1/2 inch in width between the bed of the truck and the camper shell necessarily leads to the conclusion that he thereby knowingly exposed his property to public view. This belief follows the thesis advanced by Professor Lafave in his exhaustive study, Search and Seizure, A Treatise On the Fourth Amendment, § 2.2(b) (1978). Lafave approves the general rule recognizing that the use of a flashlight as an aid in illuminating objects which would otherwise be in open view does not amount to a search. He considers the rule is applicable in situations where a flashlight is directed at an intentionally open or transparent space. However, he suggests that not all flashlight observations are deserving of a plain or open view characterization. Utilizing an analysis based on Katz, he comments:
[S]urely there comes a point where it can be said that a person has "justifiably relied" upon the privacy of his premises even though he has not taken the extraordinary step of sealing off every minute aperture in that structure. Precisely when that point is reached is a matter upon which reasonable minds might differ. But in making that judgment in a particular case, it certainly is not irrelevant that the officer was able to pierce the privacy-by-darkness inside the premises only by directing an artificial light into the building. It is one thing to say that "[t]he plain view rule does not go into hibernation at sunset," so that a person cannot claim a justified expectation of privacy based upon nothing more than the fact that what could be seen during the day can be seen during the nighttime only by artificial light. It is quite another, however, to conclude that when a person, in effect, "creates" darkness within premises by the manner in which he closes and secures the building, there can never be a constitutionally-protected expectation that this privacy will not be breached by artificial illumination manipulated from outside.
Lafave, supra, § 2.2(b), pages 253-254 (footnotes omitted).
We find this analysis convincing. One can readily consider that a person has knowingly exposed his personal effects to public view if those objects are easily visible outside the area through, for example, an open door or a transparent window. Given such circumstances, an officer would be furnished probable cause to seize contraband or other incriminating evidence within the area. And his pre-intrusive view would not be considered a search. See Ensor v. State, supra; Tyler v. United States, 302 A.2d 748 (D.C.App. 1973); People v. Whalen, 390 Mich. 672, 213 N.W.2d 116 (1973); People v. Wheeler, 28 Cal. App.3d 1065, 105 Cal. Rptr. 56 (1972); State v. Ashby, 245 So.2d 225 (1971). Therefore, if personal effects are openly exposed, it should make no difference *1278 whether illumination is used as a means of aiding the officer's identification of the contents within the area.
When, however, a possessor such as Raettig has taken affirmative measures to safeguard his property within an area from public view, a minute crack on the surface of such area can hardly be regarded as an implied invitation to any curious passerby to take a look.[3]Cf. Berryhill v. State, 372 So.2d 355 (Ala. Civ. App. 1979). On the record before us, we conclude that Raettig must be considered to have exhibited an actual expectation of privacy in the contents of his camper.
Can it be said, however, that his expectation is one that society is prepared to recognize as reasonable? This question must also be answered affirmatively. In addition to all the actions Raettig took to conceal his property from public view, he was in lawful possession of the camper-truck, having driven it with the permission of his brother. "One who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude." Rakas v. Illinois, 439 U.S. 128, 144, n. 12, 99 S.Ct. 421, 431, n. 12, 58 L.Ed.2d 387 (1978) (quoted with approval by the Florida Supreme Court in Norman v. State, supra, at 647). Clearly, then, Raettig must be said to have a "cognizable property right in the invaded area." Norman v. State, supra, at 647.
The judgments and sentences are reversed, as is the lower court's order denying the motion to suppress, and the cause is remanded for such further proceedings as are consistent with this opinion.
LILES, WOODIE A. (Retired) and PEARSON, TILLMAN (Retired), Associate Judges, concur.
NOTES
[1] This two-fold test has been specifically followed by the Florida Supreme Court in two recent cases. See Norman v. State, 379 So.2d 643 (Fla. 1980); State v. Brady, 406 So.2d 1093, (Fla. 1981).
[2] Although, as noted, Section 570.15, Florida Statutes (1979), has been construed as requiring the same probable cause standard applicable to searches in criminal cases, Pederson v. State, supra, there would appear to be no constitutional inhibition to the legislature amending the statute to provide for less exacting standards. See Camara v. Municipal Court. 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). In fact, the legislature took such action in a special 1979 session, by amending Section 570.15(1)(b) and in effect, overruling Pederson. See Ch. 79-587, § 1, Laws of Fla. That amendment, however, is not applicable here as its effective date was December 17, 1979.
[3] Superficially the facts in the instant case can be said to be very similar to those in United States v. Wright, 449 F.2d 1355 (D.C. Cir.1971), in which the seizure of evidence from a garage was sustained on a record revealing that an investigating officer had seen, with the aid of a flashlight, stolen items through a locked, but partially opened, door to the garage. Yet, there were other facts  not present here  which gave the officer the right to take "[a] closer look at a challenging situation... ." 449 F.2d at 1357. Before the garage view occurred, the officer had seen "tell-tale sweepings of nuts and bolts" in front of the garage in an area near where an automobile earlier had been stripped of its various parts.